**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHELLE F.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 22 C 0183** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, in March of 2016. (Administrative Record (R.) 194-200). She claimed that she had been disabled since November 1, 2017, due to moyamoya disease. (R. 227). Over the next twenty-one moths, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on January 12, 2022. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) a few days later, and this case was reassigned to me on January 18, 2022. [Dkt. #9]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

## I.

### A.

Plaintiff was born on February 24, 1981, making her 36 years old when she claimed she became disabled. (R. 194). Plaintiff has an excellent work record, working steadily from the time she was sixteen years old until 2019. (R. 201-02). As a "cleaner" at a bowling alley, plaintiff mopped, vacuumed, and dusted. She was on her feet all day, but lifted and carried no more than ten pounds at a time. (R. 252). Her waitressing jobs also had her on her feet all day, and carrying trays of food she thought weighed no more than ten pounds. (R. 251).

That ended when she suffered a stroke while at her cash register at work in September of 2017. There began months of treatment, beginning with brain surgery and continuing with intense rehabilitation therapy through March 2018. Plaintiff had to relearn things like walking and getting dressed, and her memory and cognitive functions were impaired as well. She improved a great deal, but she was not the same. Her left side remained weaker and less sensitive. She continued to have attention problems and memory loss. Not surprisingly, she was also depressed over her situation, and fearful of suffering another stroke.

### B.

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: Moyamoya disease, with history of strokes; depression; and anxiety. (R.16). The ALJ also noted a few non-severe impairments that were transient and mild or well-controlled with treatment. (R. 16-17). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the

2

Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ specifically considered the requirements for the Listings 11.04 (vascular insult to the brain), 12.04 (depression), and 12.06 (anxiety). (R. 17-19). As for plaintiff's limitations due to her mental impairments, the ALJ found the plaintiff had a mild limitation in understanding, remembering or applying information; a moderate limitation in mild limitation in interacting with others; a moderate limitation in concentrating, persisting or maintaining pace; and a mild limitation adapting or managing oneself. (R. 18-19).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> frequent gross and fine manipulations with the left hand; frequently climb stairs and ramps; occasionally stoop, crawl, crouch and kneel; never climb ladders, ropes and scaffolds; should avoid concentrated exposure to unprotected heights, moving and hazardous machinery and temperature extremes; limited to simple and detailed, unskilled and semi-skilled jobs, with 1-5 step instructions; and occasional contact with the general public.

(R. 19). The ALJ then reviewed plaintiff's allegations and activities at some length. (R. 20-21). She then went over the voluminous medical record, mostly the plaintiff's extensive history of treatment and hospitalizations for moyamoya disease, beginning with an acute lacunar infarction in September 2017. Plaintiff suffered a CVA and required a craniotomy in November 2017. In May 2018, she had encephaloduroarteriosynangiosis surgery for right sided cerebral ischemia. Her vision was affected, although adequate to pass a drivers' test when corrected. Consultative exams revealed reduced left hand grip strength, decreased sensation in the left arm, a slight limp, short-term memory deficit, and slowed mental functioning. She would be unable to handle finds if she received benefits. Mental status exams generally noted sad or tearful mood, and anxiousness. She reported panic attacks in

grocery stores. (R. 21-25). The ALJ then found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 25). The ALJ explained that the May 2020 treatment notes showed improvement, with memory grossly intact and normal mental status exams. The ALJ noted that much of plaintiff's depression and anxiety was due to her divorce. She had not had a stroke since 2017. She was not seeing a therapist or counselor. She said she could do a part-time cleaning job, but had to take care of her son. She had held several part-time jobs since her craniotomy. (R. 25-27).

As for medical opinions, the ALJ did not accept the g the consultative internist examination findings regarding the claimant's left side and the state agency reviewing doctors' limitation to "occasional" left manipulations, saying they were inconsistent with PT reports, which concluded that the plaintiff had only mild left-sided weakness, 4-/5 with improved status-post rehabilitation. The ALJ found APRN Wanyoma's opinion not persuasive, because it is was not consistent with objective medical evidence of record, which showed that much of the plaintiff's depression and anxiety was due to divorce, and that they were much improved after plaintiff's parents bought her a house. The ALJ found the consulting examiner's opinion that plaintiff could not handle funds not persuasive because it was vague and was outside the examiner's area of expertise. (R. 28-29).

The ALJ then relied on the testimony of the vocational expert to find that plaintiff was unable to perform her past relevant work as a waitress or teacher's aide. The ALJ further relied on the testimony of the vocational expert and found that plaintiff could perform other work that existed in significant numbers in the national economy: Office Helper (DOT code 239.567-010; (13,600 jobs);

4

Inspector and Hand Packager (DOT code 559.687-074; 35,000 jobs); and Mail Clerk (DOT code 209.687-026; (13,000 jobs). (R. 30). Accordingly, the ALJ found plaintiff not disabled and not entitled to benefits under the Act. (R. 32).

## II.

If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill,* – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained

that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. But, the Seventh Circuit has also called this requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). "If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough."

*Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[2]  In this instance, there is a disconnect between the record and the ALJ's conclusion, and the court is unable to see how the ALJ got from one to the other.

## III.

As just discussed, "logical bridges" are not of the same length or complexity; one size does not fit all.  Some reviewers need more explanation than others, and each reviewer in federal court

---

[2] Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79.

In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted). Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

is reviewing the ALJ's decisions *de novo.* So, for example, in a recent Seventh Circuit opinion, two judges on the panel needed more from an ALJ, while a the third judge on the panel, who dissented, thought the ALJ's explanation of her reasoning was adequate. *See Jarnutowski v. Kijakazi*, No. 21-2130, 2022 WL 4126293 (7th Cir. Sept. 12, 2022). And, the Magistrate Judge who reviewed the ALJ's opinion below was able to follow the ALJ's reasoning as well. *See Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *1 (N.D. Ill. June 1, 2021). In terms of what constitutes an adequate "logical bridge," every *de novo* reviewer is different. And every medical record is different. Some depict young people, unfamiliar with the demands of work, who are troubled by no more than a couple of mild impairments.

Records like those allow a court, without lengthy explanation, to follow the reasoning of an ALJ, who finds such an individual able to work on a daily basis. In those cases, there is not much of a "bridge" needed to make it from one side to the other, and review is not difficult. Again, it's not a one-size-fits-all proposition.

This is a case where a woman with an excellent work record suffered a stoke while she was working. The plaintiff suffers from moyamoya disease, which is a rare, progressive blood vessel disorder in which the carotid artery in the skull becomes blocked or narrowed, reducing blood flow to the brain. Tiny blood vessels then open up at the base of the brain in an attempt to compensate and supply the brain with blood. These tiny clusters of blood vessels cannot supply the necessary blood and oxygen to the brain, and this can result in temporary or permanent brain injury. Moyamoya disease can also cause strokes or aneurysms in the brain. https://www.mayoclinic.org/diseases-conditions/moyamoya-disease/symptoms-causes/syc-2035586 Plaintiff had a history of suffering migraines, which might have been transient ischemic accidents.

On September 14, 2017, she suffered a stroke while at her cash register at work (R. 814) – right-sided cerebral hemisphere infarcts – that caused left arm numbness, blurred vision, and slurred speech. On November 7, 2017, plaintiff had to undergo a craniotomy. She was left with slurred speech, left facial weakness, left hemiparesis, gait abnormality, left neglect, left visual deficits, and cognitive deficits. Her functional decline required months of significant inpatient and outpatient rehabilitation. (R. 879-1051). As of January 3-4, 2018, plaintiff still had a ways to go. She was below average for name recall, date orientation, and story recall, and significantly below average for facial recognition. (R. 968). She had still had severe difficulty with gait and hand-eye coordination exercises, (R. 965), and significantly impaired functional balance necessary for safe ambulation. (R. 971). By February, plaintiff was relearning how to use her smart phone, entering events in her calendar. (R. 1031-32). Memory exercises were still a challenge; without cues plaintiff was at 57% in mid-February. (R. 1036). Plaintiff demonstrated improvement into March 2018, although she still had moderate to marked impairments in attention. (R. 1048-50). By the conclusion of the intensive therapy in March, plaintiff improved significantly, but would have to use trained strategies with stand-by family support. She was not yet able to drive and would benefit from additional skilled therapy. (R. 1050-51). As of March 22, 2018, for example, the plaintiff still had difficulty orienting herself to get dressed (R. 908).

At that point, there can be no argument that plaintiff had been unable to work either physically or cognitively for seven months. What she had gone through up to that point can only be described as an ordeal. And the foregoing summary did not even go into depth. For plaintiff, it was day after day, week after week, of relearning just about everything. But, the ALJ described it like this:

> Records from Northwestern McHenry Hospital show that the claimant was admitted on November 14, 2017 for inpatient rehabilitation, due to cerebrovascular accident (CVA) and Moyamoya disease. She presented with gait abnormality and cognitive dysfunction secondary to bilateral internal carotid artery stenosis consistent with moyamoya disease pattern with right middle cerebral artery territory watershed strokes on September 14, 2017, status post right temporal craniotomy for encephalo-duro-anrterio-synangiosis on November 7, 2017, aneurysm of the left internal carotid artery. She was diagnosed with CVA, Moyamoya disease, adjustment disorder with mixed anxiety and depressed mood, history of depression, anxiety and ADHD. She was discharged in March 2018 (4F).

(R. 22). That's it: stroke, surgery, discharge. It really doesn't seem terribly bad at all, when one puts it that way.

Now, "[s]ummaries of medical evidence, while definitionally 'partial and selective,' are appropriate" *Grotts*, 27 F.4th at 1278; *Gedatus*, 994 F.3d at 901, but what the ALJ did here was, to put it mildly, superficially gloss over a significant portion of the record. It leaves a reviewing court with the impression that the ALJ didn't really take this seriously, and that that affected her conclusions.

Despite the tone of the ALJ's opinion, it's not as though everything was back to normal after plaintiff's discharge from rehabilitation therapy. On May 10, 2018, plaintiff still had missing vision on the left side, decreased acuity, and difficulty paying attention. Her memory loss was still bad, even very short term. She would laugh inappropriately. (R. 814-816). In a cognitive exam on May 13, 2018, plaintiff was unable to draw in the numbers on a blank clockface. (R. 1166-67). On July 9, 2018, plaintiff still had some loss of function and loss of sensation in the left hand. She was depressed and at times, tearful (R. 820) – although, her gait and station were normal. (R. 821).

On January 10, 2019, plaintiff asked for a medication adjustment from adderal to celaxa, because it was not helping her memory loss. She also asked for a psych referral because she was

suffering increased depression over her loss of memory. (R. 832-33). A March 21, 2019 CT scan showed post operative changes relating to indirect encephaloduraloarteriosynangiosis. There was also occlusion of the of the cavernous and supraclinoid internal carotid arteries. There was an artery segment on the right side that was incongruent with small intervening collateral vessels and a relatively large region of encephalomalacia within the right middle cerebral artery distribution. (R. 840-41).

Oddly, the ALJ made no mention of that objective study. (R. 22). It seems to be evidence that runs counter to her conclusions, so she was not free to ignore it. Like the court, it's unlikely she would have fully understood it, if she had reviewed it. *But that's what medical experts are for! See* 20 C.F.R. § 404.1527(c)(2)("An ALJ may obtain a medical expert's opinion for several reasons, including to clarify and explain the evidence . . . ."); *Gebauer v. Saul*, 801 F. App'x 404, 408 (7th Cir. 2020)("The use of a medical expert can help ALJs resist the temptation to 'play doctor,' a label that usually produces a remand on judicial review, by evaluating medical evidence on his or her own."). If the ALJ didn't understand the study, the answer wasn't to ignore it; the answer was to have an expert explain it!

In any event, at the point when the January 2019 CT scan was done, plaintiff was about sixteen months removed from her stroke. Recall that, in order to qualify for disability benefits, a plaintiff has to prove that her disability "lasted or [can] be expected to last for a continuous period of not less than 12 months" 42 U.S.C.A. § 423(d)(1)(A). *See also Gedatus*, 994 F.3d at 898 ("To be considered disabled, [plaintiff] had to prove [ ]she was unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last at least 12 straight

11

months."); *Walker v. Bowen*, 834 F.2d 635, 636 (7th Cir. 1987)("To be eligible for [disability] benefits, the [plaintiff] must show that he has been totally disabled for at least twelve consecutive months."). Residual functional capacity means the level of work a claimant can "perform 8 hour a day, 5 day a week ... 'regular employment' on a 'regular and continuing basis.'" *Jeske v. Saul*, 955 F.3d 583, 593 (7th Cir. 2020); *see also Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)(RFC is "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from her impairments."). With all deference, we do not see anything in the medical record at this point in time that suggests that plaintiff had progressed from relearning how to walk and get dressed to being able to perform semiskilled light work, involving detailed one to five-step instructions five days a week, fifty weeks a year. That's not to say there isn't any such evidence. It's just to say that the ALJ certainly didn't explain her contrary view of the record.

By that time, plaintiff had applied for disability benefits and had to have a consultative exam with Dr. Roopa Karri on October 13, 2020. The doctor's neurological findings were abnormal. She noted decreased sensation in the left arm and difficulty performing left finger to nose test. Plaintiff had a slight limp and moderate difficulty tandem walking. Mental status exam went slowly. Short term memory was 1/3. Plaintiff was only able to recall one previous president. She could not perform serial sevens past 100-7=93, despite excellent effort and cooperation. The doctor felt plaintiff would not be able to handle funds on her own if she were granted benefits. (R. 1108).

At that point it had been three years since plaintiff's stroke, well over twelve months. Plaintiff's cognitive function, per Dr. Karri's findings, doesn't appear to qualify her for work remembering and following detailed five-step instructions. The ALJ had to come to grips with the agency's consulting examiner saying that plaintiff's memory and cognitive function were

12

significantly impaired, *see Grotts*, 27 F.4th at 1278; *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020); so unfortunately, she simply dismissed Dr. Karri's examination findings and opinion, saying that they were vague and outside the doctor's area of expertise. (R. 28-29). But, Dr. Karri's report was not vague at all. And while plaintiff may have depression, her cognitive and left-side issues are the result of an undoubted physical, neurological impairment, that no one disputes, is within Dr. Karri's expertise. Indeed, Dr. Karri is a frequent consultative examiner; if she is incapable of assessing neurological issues, ALJs would not routinely rely on her findings – as they so often do. *See, e.g., Colleen M. v. Saul*, No. 19 C 1287, 2021 WL 822934, at *4 (N.D. Ill. Mar. 4, 2021)(ALJ accepting Dr. Karri's mental status findings); *Kevin H. v. Saul*, No. 18-CV-5798, 2020 WL 6870818, at *6 (N.D. Ill. Nov. 23, 2020)(ALJ giving "significant weight" to Dr. Karri's mental status findings); *Krystal C. v. Saul*, No. 19 C 2696, 2020 WL 6134983, at *5 (N.D. Ill. Oct. 19, 2020)(ALJ dismissing the neuropsychological and psychological findings of a psychologist in favor of Dr. Karri's); *Scheie v. Berryhill*, No. 16 C 9012, 2018 WL 1586247, at *3 (N.D. Ill. Apr. 2, 2018)(ALJ accepting Dr. Karri's neurological assessment); *Yancey v. Berryhill*, No. 16 C 10836, 2018 WL 1278192, at *9 (N.D. Ill. Mar. 12, 2018)(ALJ relying on Dr. Karri's mental status findings); *Kelly v. Colvin*, No. 14 C 1086, 2015 WL 4730119, at *6 (N.D. Ill. Aug. 10, 2015)(ALJ accepting Dr. Karri's mental status findings over those of a psychiatrist); *Rodriguez v. Astrue*, No. 11-CV-5637, 2012 WL 5995738, at *10 (N.D. Ill. Nov. 30, 2012)(ALJ accepting Dr. Karri's neurological findings). Simply put, the ALJ had to give good reasons for rejecting Dr. Karri's findings. *See Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014); *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016). She did not do so here.

Much of the ALJ's attention and discussion was taken up by medical findings in 2020. (R. 22-24). As already suggested, those findings came well past the twelve-month mark for qualifying for disability. But, for the ALJ, 2020 treatment notes seemingly trumped all that came before them:

> Although 2020 treatment notes reveal that she has responded well to therapy and Effexor, as evidenced by mostly intact clinical findings, including intact cognition and memory, during many office visits (14F/2, 4-5 and 7-8); no documentation of exacerbation of her depressive and/or anxiety symptoms, which would require a more aggressive form of treatment; and a wide range of activities described by the claimant (i.e., following a daily routine, caring for her son, cleaning, grocery shopping with someone, doing laundry and dishes, cooking, taking walks and jogging, etc. (testimony), the medical evidence of record reveals that she does have some issues with short term memory and recall deficits, which were documented in November 2017 (13F/29-32), March 2020 (14F/7-8), October 2020 (7F) and March 2021 (16F). Therefore, the undersigned finds that the claimant is limited to simple and detailed, unskilled and semi-skilled jobs, with 1-5 step instructions.

(R. 26). We're not sure how memory and recall deficits qualify the plaintiff to perform what the ALJ termed simple and detailed work with one- to five-step instructions. "Simple and detailed" are, after all, opposite ends of the spectrum, so that's really no accommodation for impaired memory and recall at all. And the three office visits the ALJ cited do not qualify as "many."

As it happens, the actual evidence of record in 2020 paints a far more dire picture than the ALJ did. Consider the following:

> February 18, 2020– self care neglected; poor eye contact; slow speech with long pauses; mood sad, anxious, fidgety; thought process slow but coherent; judgment fair (R. 1134)

> February 24, 2020– needs someone to accompany her to the store, mood anxious, guarded at times, limited eye contact, fidgeting, depressed and sad (R. 1133)

> March 2, 2020– needs someone to accompany her to the store, mood anxious, guarded at times, limited eye contact, fidgeting, depressed and sad (R. 1127-28)

> March 9, 2020– needs someone to accompany her to the store, mood anxious, guarded at times, limited eye contact, depressed and sad (R. 1127-28)

14

March 16, 2020– needs someone to accompany her to the store, mood anxious, guarded at times, limited eye contact, depressed and sad (R. 1127-28)

March 19, 2020– memory intact, struggled a bit with recall, speech slow (R. 1382)

March 23, 2020– needs someone to accompany her to the store, mood anxious, guarded at times, limited eye contact (R. 1125-26)

March 30, 2020– needs someone to accompany her to the store, mood anxious, guarded at times, limited eye contact (R. 1123-24)

March 31, 2020 – mood and affect: a bit anxious; memory intact but taking notes. (R. 1381)

April 6, 2020– needs someone to accompany her to the store, mood anxious, guarded at times, limited eye contact, sad and tearful (R. 1121-22)

April 13, 2020– needs someone to accompany her to the store, mood anxious, guarded at times, limited eye contact (R. 1117-18)

April 27, 2020– mood anxious, guarded at times, having panic attacks at grocery store, limited eye contact (R. 1117-18)

April 28, 2020– mood much more stable, less panic, still has some anxiety going out. (R. 1379)

May 9, 2020– mood anxious, guarded at times, limited eye content, fidgeting, having panic attacks at grocery store (R. 115-16).

May 18, 2020 – mood anxious, guarded at times, having panic attacks at grocery store, limited eye contact (R.1113-14)

May 14, 2020 – mood: stable, happy; affect: full; thought process: linear; good insight; good judgment. (R. 1377).

May 3, 2021– afraid because losing her memory after strokes and surgery, difficulty with short term memory. Depressed mood, poor concentration. Mood: anxious, crying (R. 1410); thought content forgetful; insight and judgment: fair; memory: fair (R. 1411)

Not surprisingly, there is not a lot in these "psychological" therapy notes regarding memory

issues, and that is because plaintiff's memory deficits are due to a *physical, neurological impairment*,

not a psychological one. As for her psychological issues, through 2020, the treatment notes show plaintiff making little or no progress regarding her fear of being out in public alone. That makes sense: she, like so many individuals who have had prior strokes, is likely fearful of having another stroke without someone she trusts on hand to help her. But, who wouldn't be? *Giroux v. Sherman*, 807 F.Supp. 1182, 1187 (E.D.Pa. 1992). The ALJ seemed to think this was going to be assuaged by "limiting the claimant to occasional contact with the general public." (R. 26). With all deference, we don't see how.

So, this case has to be remanded; the "logical bridge" requirement has not been met. The record here is such that a denial of benefits requires a Mackinac Bridge type of effort, not a couple of skips. As such, it's worthwhile to mention a couple of points regarding the vocational evidence that are a bit murky. The ALJ said plaintiff's residual functional capacity ruled out her old "cleaner" job. (R. 29). The cleaner job was light, unskilled, and had an SVP of 2. If plaintiff cannot perform her old cleaner job, then it's difficult to see how she could perform the jobs of office helper, inspector and hand packager, or mail clerk, which are all light work, unskilled, with SVPs of 2. (R. 29). The ALJ offered no explanation for why plaintiff can't do her cleaner job, other than to incorrectly say the vocational expert testified a person with the residual functional capacity the ALJ found for the plaintiff couldn't do that job. Actually, the vocational expert testified such a person *could* do that job. (R. 61).

Then there is the "one- to five-step instruction" limitation. If it's not clear what exactly that means, it is even less clear when one considers the ALJ's explanation at the administrative hearing. Whatever the task or job, that job or task was, for the ALJ, one step. If, in reality, emptying the trash took several steps, it was still one step for the ALJ, because it was one job: empty the trash. Sorting

16

the mail, even though different types of mail might call for different responses in term of tasks, was one task, and one step: sort the mail. (R. 63-67). One wonders, as plaintiff's counsel understandably did, how far that improper, oversimplified way of looking at tasks goes.[3]

## CONCLUSION

For the foregoing reasons, the plaintiff's motion to reverse the decision of the ALJ [Dkt. #12] is granted, the defendant's for affirmance [Dkt. #17] is denied. This case is remanded to the Commissioner.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/5/22

---

[3] One wonders, as well, how someone with impaired recall, such that she can only recall one item out of three or perform a single step of serial sevens could handle all the necessarily varied and numerous functions of "Office Helper," regardless of how many steps were involved. The Dictionary of Occupational Titles describes the job of Office Helper as follows:

> Performs any combination of following duties in business office of commercial or industrial establishment: Furnishes workers with clerical supplies. Opens, sorts, and distributes incoming mail, and collects, seals, and stamps outgoing mail. Delivers oral or written messages. Collects and distributes paperwork, such as records or timecard, from one department to another. Marks, tabulates, and files articles and records. May use office equipment, such as envelope-sealing machine, letter opener, record shaver, stamping machine, and transcribing machine. May deliver items to other business establishments [DELIVERER, OUTSIDE (clerical) 230.663-010]. May specialize in delivering mail, messages, documents, and packages between departments of establishment and be designated Messenger, Office (clerical). May deliver stock certificates and bonds within and between stock brokerage offices and be designated Runner (financial).

https://occupationalinfo.org/23/239567010.html.

18